U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

AUG 18 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

---

NEWMAN MARCHIVE
PARTNERSHIP

versus

KEITH HIGHTOWER, Individual Capacity;
CEDRIC GLOVER, In His Official
Capacity as Mayor of the City of
Shreveport; CITY OF SHREVEPORT

CIVIL ACTION NO. 06-1664
JUDGE TOM STAGG

---

## <u>MEMORANDUM RULING</u>

Before the court is a remand from the Fifth Circuit Court of Appeals, vacating the summary judgment denying the plaintiff's equal protection claims and reversing the denial of the retaliation claims. On remand this court is directed to address the remaining elements of the pending claims in accord with the terms of the Fifth Circuit's opinion. <u>See</u> Record Document 54. Following the remand, the parties have once again filed cross-motions for summary judgment. The plaintiff, Newman Marchive Partnership, Inc. ("Newman"), has filed a motion for partial summary judgment. <u>See</u> Record Document 62. Keith Hightower, the former Mayor of the City of Shreveport (hereafter referred to as "Mayor Hightower") and the City of

1

Shreveport (sometimes collectively referred to as "the defendants") have filed a memorandum urging summary judgment and the dismissal of the plaintiff's entire case. See Record Document 57. After considering the record in its entirety, and in particular the Fifth Circuit's prior ruling in this case, the court finds that Newman's motion should be **GRANTED** in part and **DENIED** in part, and the defendants' motion should be **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Two money judgments were issued in favor of Newman against the City of Shreveport, Louisiana by the 1st Judicial District Court in Caddo Parish, Louisiana. See Record Document 25 at 1. One judgment concerned an architectural contract with the city to renovate Independence Stadium (the "stadium contract"), and the other concerned a contract to develop a "Campus Plan" for governmental facilities (the "campus plan contract"). See Record Document 54 at 2. The city has paid the principal amount due on these judgments, but has refused to tender the corresponding judicial interest. See Record Document 25 at 2-3; Record Document 62 at 1. Newman claims the city has failed to tender this money based on personal, vindictive, illegal motivations, while the city maintains that the decision not to pay the interest was based on generally applicable ordinances and policies designed to promote the best interest of the City of Shreveport. See Record Documents 62 at 1 and 67 at 1.

2

Based on the scenario described above, pursuant to the provisions of 42 U.S.C. § 1983, Newman filed a claim for a money judgment against former Mayor Hightower, in both his official and individual capacities, and the City of Shreveport.[1] See Record Documents 1, 17 and 25 at 6. Both parties acknowledge that such a claim against a municipality and its officials must satisfy three essential elements: (1) the conduct complained of must be committed by a person acting under color of state law; (2) the conduct must deprive a person of rights, privileges or immunities secured by the Constitution or laws of the United States; and (3) the municipality's policy or custom must have played a part in the violation of federal law. See Record Documents 62 at 5 and 67 at 2; see also James v. Texas Collin County, 535 F.3d 365, 373 (5th Cir. 2008); Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658,694, 98 S.Ct. 2018, 2037-38 (1978). In regard to the second element, Newman has claimed that it was deprived of its rights under the Equal Protection Clause of the Fourteenth Amendment in that it was treated differently and more harshly than similarly situated judgment creditors (the "equal protection claim"). See Record

---

[1]As noted in the electronic minutes after Record Document 8, under the federal rules, upon his election, the new mayor of Shreveport, in his official capacity, was automatically substituted for former Mayor Hightower, in his official capacity. This change is also noted in the caption of the Fifth Circuit's opinion. See Record Document 54 at 1.

Document 25 at 6. Newman also has claimed it was the victim of unlawful government retaliation for the exercise of its First Amendment right to file and prosecute a civil lawsuit against a municipal government (the "retaliation claim"). See id.

This court issued a memorandum ruling and an accompanying judgment on cross-motions for summary judgment in this case in February of 2009 which dismissed all of Newman's claims with prejudice. See Record Documents 45 and 46. As noted above, the Fifth Circuit vacated this judgment in part and reversed in part and remanded for further proceedings in accordance with its opinion. See Record Document 54. On remand, the parties do not dispute that the first required element of this section 1983 claim has been satisfied, i.e., that the conduct complained of was committed by a person or persons acting under color of state law. See Record Documents 62 at 5 and 67 at 2. Thus, this court will first determine whether there was any deprivation of constitutional rights in this case. Thereafter, under the section addressing liability, the court will consider the final, third required element of this section 1983 claim, that is whether a municipal custom or policy played a role in the violation of federal law.

## II.  LAW AND ANALYSIS

**A.    Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004).  If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).

All facts and inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts are resolved in that party's favor. See Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990). If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied. See id.

5

**B.      Deprivations of Constitutional Rights.**

**1.      The Equal Protection Claim.**

Newman may prevail on its equal protection claim under a "class of one" theory. See Record Document 54 at 3. This theory requires Newman to show (1) that it was intentionally treated differently from others similarly situated and (2) that there was no rational basis for the difference in treatment. See id. The Fifth Circuit did not disturb this court's prior finding that Newman has satisfied the first prong of this test. However, the court of appeal did direct this court to re-examine its finding under the second prong, to determine whether Newman has met its burden of showing that there is no conceivable rational basis for the different treatment Newman received. See id.

According to this court's prior ruling, Newman was treated differently than other similarly situated judgment creditors in two ways: (1) the judgments Newman secured in state court were not paid outright, but were instead referred by the mayor to the city's risk management committee and this committee conducted a special review of Newman's judgments to determine whether or not to pay the amount due based, in part, on the manner in which Newman acted during the course of the litigation,[2] and (2) the city decided not to pay Newman judicial interest and Newman

---

[2]The campus plan case and the stadium case were only reviewed by the risk management committee after judgments were issued in these cases. This was a departure from the standard practices of the time. At the point it was considered by the risk management committee, the

has, in fact, not been paid any of the judicial interest awarded to it by the state courts. See Record Document 45 at 10; see also Record Document 22, Ex. 1. Newman bears the burden of showing that there is no conceivable rational basis for this difference in treatment. See Record Document 54 at 3.

### a. The Referral To The Risk Management Committee.

According to the city, the risk management committee was created by ordinance, all claims against the City of Shreveport are subject to review by the committee, and the committee has the authority and discretion to determine what claims the City of Shreveport will pay. See Record Document 22, Ex. 3, Answer to Interrogatory 2. An examination of the transcript of the deposition of the former chief administrative officer of the City of Shreveport, Kenneth Antee, Jr. ("Antee") and a transcript of the testimony of the risk manager for the City of Shreveport, Tom Cody ("Cody"), reveals that the common practice of this committee was to discuss cases

---

stadium judgment was final and definitive. See Record Document 45 at 2 (stating this judgment became final and definitive on June 23, 2006); Record Document 22, Ex. 3, Answer to Interrogatory 2 (stating that the risk management committee reviewed the stadium judgment on September 11, 2006). The committee reviewed the campus plan judgment after it had been issued by the trial court, but while it was still pending on appeal. See Record Document 22, Ex. 3 at 5 (stating the risk management committee reviewed the campus plan "judgment" on September 27, 2006); Newman Marchive P'ship, Inc. v. City of Shreveport, 944 So.2d 703 (La. App. 2d Cir. 2006) (the appellate decision in the campus plan case dated November 1, 2006); Record Document 45 at 3 (stating the campus plan judgment became final and definitive on March 9, 2007). In both cases, when final and definitive judgments were presented to the city for payment, the city denied payment of judicial interest.

prejudgment, frequently before suits were even filed.  See id., Ex.1 at 48-53 and Ex.

4 at 30.  Its primary purpose was to negotiate and settle claims against the city.  See

id. As noted above, what was unusual about Newman's cases is that these cases were

only referred to and considered by the risk management committee *after a judgment*

*had been rendered* in each matter by a state court.  When the two final judgments

were presented to the city for payment, they were not simply paid in-full by a check

signed by the mayor.  These judgments were referred to the risk management

committee for a decision as to whether and/or how much the city would actually pay

Newman.  At least in regard to the stadium judgment, the committee's decision was

based, in part, on a special review of Newman's prejudgment activities, (i.e.,

essentially how Newman conducted itself during its  litigation against the city). See

Record Document 22, Ex. 1 at 45-47, 52-53 and Ex. 4 at 29-30 ; Record Document

25 at 10; Record Document 30, Ex. 7 at 30. Over the course of eight to ten years in

which nearly twenty-five judgments were rendered against the city, only Newman and

one other judgment creditor were subject to this special post-judgment review by the

risk management committee.  See Record Document 22, Ex. 1 at 50-53 and Ex.  5.

Turning to the search for a rational basis for these actions, the court first notes

that, in its prior ruling, the Fifth Circuit rejected several proposed rational bases for

this differential treatment.  See Record Document 54 at 4.  Second, in its present

8

motions, the defendants have attempted to justify this differential treatment by re-asserting an argument which was addressed in this court's previous ruling. They argue that the referral of one other judgment creditor, Whitaker Construction Company ("Whitaker"), to the risk management committee after that creditor had secured a judgment demonstrates that Newman was not treated differently than other judgment creditors. See Record Document 67 at 2-5. As this court found in its previous ruling:

> This argument is unavailing for several reasons. First, Whitaker was paid the entirety of its judgment, including judicial interest. See Record Document 1, Ex. A. Second, even if Newman and Whitaker were treated similarly, Newman was still treated differently than . . . sixteen [other] judgment creditors . . . .

Record Document 45 at 10.

Both Antee and Mayor Hightower indicated that Newman's judgments were subjected to this special review because of a particular ruling made by a state district judge. See Record Document 22, Ex. 1 at 25 and 53; Record Document 30, Ex. 7 at 30-32. In the referenced ruling, a state district judge held that a provision within one of the contracts between Newman and the city constituted a valid waiver, on Newman's part, of all rights to judicial interest due on any judgments awarded on the basis of the contract. See Record Document 43, Ex. B. According to Antee, although the trial judge's ruling in regard to the waiver of interest was overruled by

9

a state appellate court, the ruling of the lower court inspired city officials to consider whether they could adopt a policy "across the board" which would allow the city to legitimately refuse to pay interest on any state court judgment. See Record Document 22, Ex. 1 at 53; Newman Marchive P'ship, Inc. v. City of Shreveport, 923 So.2d 852, 861-62 (La. App.  2d Cir. 2006).  The resulting research exposed city government officials to case law and example ordinances from other cities concerning the ability of a municipality to refuse to pay state court judgments, and eventually led to the passage of an ordinance by the Shreveport City Council on September 26, 2006, which announced a new policy that the city would not pay judicial interest on state court judgments. See, e.g., Record Document 22, Ex. 1 at 25, 29-39 and 53; id., Ex. 7 at 4.

The aforementioned reasoning does not constitute a valid, rational basis for treating Newman's judgments differently than every other judgment in the past eight to ten years, with the exception of the judgment procured by Whitaker.  First, as previously mentioned, the referenced state trial court ruling was explicitly overruled in regard to the interest question. See Newman Marchive P'ship, Inc., 923 So.2d at 861-62.  Its logic was soundly contradicted by a state appellate court and writ was summarily denied by the Louisiana Supreme Court. See id.; Newman Marchive P'ship, Inc. v. City of Shreveport, 930 So.2d 983 (La. 2006).  This court likewise

10

has previously reviewed and rejected the defendants' argument regarding the contractual provisions at issue in the state cases.  See Record Document 45 at 12. Second, the referenced ruling by the state trial court was signed on August 27, 2004. See Record Document 43, Ex. B.  Yet, the record shows that in the time subsequent to this ruling, the city paid several judgment creditors both principal and judicial interest without any post-judgment referral to the risk management committee for a special post-judgment, pre-payment review.  See Record Document 22, Ex. 5 and Ex. 1 at 50-53.  If the discovery of a municipality's ability to resist the payment of a state court judgment, inspired by the referenced state trial court judgment, constituted a rational basis for further pre-payment, post-state-court-judgment review by the risk management committee, then all state court judgments awaiting payment by the city as of August 27, 2004, would have been treated in a manner similar to Newman's judgments, but they were not.  See generally Record Document 54 at 4.

Even though the explanations offered by the defendants fail to pass rational-basis scrutiny, this court must go a step further and determine whether there is another reasonably-imaginable rationale that would survive the rational basis test.  See Record Document 54 at 4.  After reviewing the record and after exercising reasonable imagination, the court finds that there is no rational basis for the defendants' decision to treat Newman's state court judgments differently than other judgments by referring

11

these judgments to the risk management committee for post-judgment, prepayment review.

### b. The Failure To Pay Interest.

#### i. The Stadium Judgment.

In regard to the stadium judgment, the city has proffered several reasons to justify its decision to forego payment of judicial interest. In previous court rulings, the vast majority of these reasons have been rejected as valid, rational bases. See Record Documents 45 and 54. Only to the extent that it was not addressed in prior judgments, the court notes that Newman's litigation tactics during the stadium judgment do not provide a rational basis for the defendants' decision to forego payment of judicial interest on this judgment. See Record Document 22, Ex. 3, Answer to Interrogatory 2 (wherein the defendants state that one of the primary motivations for denying Newman payment of judicial interest was Newman's litigation tactics); Record Document 10, Exs. B and D (affidavits confirming the same). As explained in the section of this ruling reviewing the retaliation claim, the stadium suit and the tactics employed therein were, on the showing made, protected by the First Amendment. Finally, in accordance with the Fifth Circuit's previous ruling in this case, this court has reconsidered the record as a whole and has exercised reasonable imagination to consider whether any other rational basis exists which

12

justifies the defendants' decision to treat Newman differently than other judgment creditors by denying it payment of the judicial interest due on the stadium judgment. See Record Document 54 at 4. The court finds that there is no rational basis for this action.

### ii. Campus Plan Judgment.

In previous court rulings, several potential rational bases for the defendants' decision not to pay interest on the campus plan judgment have been rejected. See Record Documents 45 and 54. However, this court has not previously addressed the defendants' argument that a new city ordinance establishing a policy that the City of Shreveport will not pay interest on state court judgments provided a rational basis justifying the defendants' differential treatment of Newman's campus plan judgment.[3] The risk management committee initially decided not to pay Newman judicial interest on the campus plan judgment[4] the day after the ordinance in question was passed by

---

[3] As the city has noted, this ordinance became effective after the stadium judgment became final and definitive, but before the campus plan judgment became final and definitive. See Record Document 30, Ex. 4; Record Document 67 at 10. Thus, the city only argues that the ordinance applies to the campus plan judgment. See Record Document 67 at 10.

[4] See Record Document 57 at 2 (stating the judgment known as the campus plan judgment had a state docket number of 478,933); Record Document 22, Ex. 3 at 5 (defendants' answer to an interrogatory stating that on September 27, 2006, the risk management committee decided that, in regard to the judgment in the case of 478,933, only the principal amount of judgment should be paid and judicial interest should not be paid based on Ordinance No. 153 of 2006); id., Ex. 7 (noting that Ordinance No.153 of 2006 was passed by the Shreveport City Council on September 26, 2006, but was not effective until October 10, 2006); see also id., Ex. 10, § 4.23 (provision of the Shreveport City Charter which states ordinances have no effect until several

13

the city council, but before the effective date of this ordinance.[5] At this time, Newman's campus plan judgment was not yet final and definitive; thus, it was not yet outside the scope of appellate review.   After Newman's campus plan judgment became final and definitive on March 9, 2007, the city authorities acted in accordance with the decision of the risk management committee and, relying on the then effective ordinance, denied Newman payment of judicial interest. See Record Document 45 at 3 (stating the campus plan judgment became final and definitive on March 9, 2007).

In this court's original summary judgment ruling, interrogatory responses in Record Document 22, Ex.  5, were cited in support of the finding that the city had treated at least sixteen other judgment creditors differently than Newman.  See Record Document 45 at 9-10.  The information in these interrogatory responses indicates that all creditors who were paid judicial interest had received judgments which were not on appeal and were paid prior to the effective date of the ordinance in question, October 10, 2006. See Record Document 30, Ex.  4; Record Document 22, Ex.  5.  Thus, it seems the ordinance noted above provides a rational basis for treating Newman differently from these other creditors as it concerns the campus plan

---

requirements have been met).

[5]At the time the risk management committee made this initial decision, the campus plan judgment had been rendered by the trial court, but was still pending on appeal.  See supra note 2.

judgment. Newman has submitted several arguments in an effort to nullify any effect the ordinance may have on its campus plan judgment. As explained below, these arguments are not persuasive.[6]

Newman argues that the version of the ordinance relied upon by the defendants was not effective when the campus plan judgment became final and definitive on March 9, 2007, because the publication requirements of section 4.23 of the Shreveport City Charter were not satisfied at that time. See Record Document 62 at

_____

[6]In this ruling, the court finds the ordinance in question serves as valid justification for the defendants' actions in some respects, but not others. This is simply based on the different standards applicable to different legal arguments.

In the sections following, under the retaliation analysis, the ordinance noted above does not prohibit a finding that the city's decision to deny Newman payment of judicial interest on the campus plan judgment was an unconstitutional retaliatory action. Under the Fifth Circuit's previous ruling in this case, this court is directed to re-examine only a few elements under the retaliation analysis. One of these elements requires proof of the defendants' intent to retaliate against the plaintiff for exercising a constitutionally protected right. In their interrogatory responses, the defendants clearly admit that in passing the ordinance in question, which is their justification for their denial of judicial interest payments to Newman on the campus plan judgment, they were substantially motivated by Newman's protected litigation activity. See Record Document 22, Ex. 3. This is sufficient to find an unconstitutional retaliatory action.

In contrast, above, the court finds that the ordinance serves as a rational basis justifying the defendants' decision to deny payment of judicial interest on the campus plan judgment. The "rational-basis" standard "is the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." A.M. ex rel. McAllum v. Cash, 585 F.3d 214, 226 (5th Cir. 2009) (citation and quotations omitted). If there is any reasonably-imaginable rationale justifying the city's actions, this will satisfy rational basis scrutiny. Even though the city has admitted that the passage of the ordinance was substantially motivated by unconstitutional retaliatory animus, the record indicates that retaliatory animus was not the *only* reason behind the enactment of the ordinance. See Record Document 22, Ex. 1 at 29-40; Record Document 67 at 16. These non-retaliatory motivations are sufficient to support the city's argument that the ordinance provides a rational basis for the defendants' differential treatment of the campus plan judgment under the equal protection analysis.

12. Section 4.23 of the city charter provides:

> No ordinance or resolution, except an emergency ordinance, shall become effective *until it has been published in the official journal* and seven (7) days have elapsed after its approval by the mayor or its readoption by the council after his disapproval.

Record Document 22, Ex. 10, § 4.23 (emphasis added). In support of this argument, Newman has submitted an affidavit from John S. Hodge ("Hodge"), who is counsel of record for Newman. See Record Document 33, Ex. 1. In this affidavit, Hodge represents that he repeatedly checked the *website* of the publisher of the city's municipal code. As recently as April 19, 2007, Hodge represents that the version of the pertinent ordinance which was published on this website was different[7] than the version of the ordinance on which the defendants presently base their arguments. The version initially posted to the website contained an exemption applicable to the campus plan judgment.[8] Newman argues that there is no summary judgment evidence to show that the version of the ordinance relied upon by the defendants, which is

---

[7]Relying on a close examination of attached minutes of the city council, the defendants argue that the alternative version of the ordinance published on the referenced website during the time period at issue was the result of a clerical or administrative error. See Record Document 67 at 7-9.

[8]While the alternative version of the ordinance published on the website also stated that the city would not pay interest on judgments, it specifically limited this policy to lawsuits filed after September 26, 2006. See Record Document 33, Ex. 1. The campus plan lawsuit was originally filed on September 19, 2003. See Newman Marchive P'ship, Inc. v. City of Shreveport, 944 So.2d 703, 706 (La. App. 2d 2006).

16

presently available on the referenced website, was published on the website until May 11, 2007,[9] after the campus plan judgment became final and definitive.   Thus, Newman argues the version of the ordinance preferred by the defendants cannot be applied in this case.  See Record Document 62 at 3-4.

Newman's argument on this point is flawed.  As stated, the affidavit upon which Newman bases its argument concerns text placed on an "official website."  See Record Document 33, Ex. 1.  However, the pertinent publication requirements of the Shreveport City Charter refer to publication in the "official journal."  Record Document 22, Ex. 10, § 4.23 (emphasis added).  The official journal for the City of Shreveport for the period commencing July 1, 2006, through June 30, 2007, was "The Times," a daily newspaper published in Shreveport. SHREVEPORT, LA., Res. No. 80 (2006); see also La. R.S. 43:140, et. seq.  (describing official journals as "newspapers").  Newman has not introduced any evidence into the record which indicates that the version of the pertinent ordinance on which the defendants rely was not duly published in the *official journal* in a timely manner.  Furthermore, the court notes that the record contains a copy of the ordinance at issue containing the language relied upon by the defendants in this case which is certified by the clerk of the council

---

[9]The May 11, 2007, date apparently references the date printed on the exhibit offered by the defendants in rebuttal, which is marked in a manner indicating it is from the same website referenced by Newman.  See Record Document 30, Ex. 6

of the City of Shreveport. See Record Document 22, Ex. 7. The clerk of the council certified that the key language was effective on October 10, 2006. See id. The city charter of Shreveport indicates that the clerk's notation of an effective date refers to the date by which all the requirements of section 4.23 of the charter have been fulfilled, including the publication requirements discussed in Newman's memorandum. See Record Document 22, Ex. 10, §§ 4.23 and 4.24. Accordingly, Newman's first counter-argument to the ordinance must fail.

Newman also argues that the city cannot rely on the referenced ordinance to justify its actions because this would impermissibly, retroactively alter Newman's substantive rights. See Record Document 62 at 13-14. Newman asserts that, prior to the enactment of the ordinance at issue, city policy mandated that judicial interest awarded on state court judgments be paid. According to Newman, the ordinance relied upon by the defendants changed this policy and thus effected a substantive change to the applicable law. Newman argues that "in the absence of legislative expression to the contrary, changes in the law during the course of a suit that are procedural and interpretive apply both prospectively and retroactively, but those that are substantive apply only prospectively." Horaist v. Doctor's Hosp. of Opelousas, 255 F.3d 261, 269 (5th Cir. 2001). Newman then asserts that it has the right to be governed by the municipal policy/law regarding the payment of judicial interest

18

which was in effect at the time of the initiation of the campus plan suit in 2003,[10] rather than by changes in the municipal law which were made during the suit.

The ordinance in question became effective October 10, 2006.  See Record Document 22, Ex. 7.  The campus plan judgment became final and definitive on March 9, 2007.  See Record Document 45 at 3.  Assuming that Newman is correct in asserting that this ordinance effected a substantive change in the law and thus should only apply prospectively, that requirement is met here. The city applied the ordinance to a judgment which became final and definitive after the ordinance became effective, not before.  To the extent Newman implies it had a vested right in the campus plan judgment and the interest accruing under that judgment prior to the date appellate review was exhausted and the judgment became final and definitive, this assertion is in error.  See Sun Oil Co. v. Burford, 130 F.2d 10, 19 (5th Cir. 1942) ("No one may acquire a vested interest in a decision until the time has elapsed in which the court has jurisdiction to change it.") (rev'd on other grounds); Columbraria Ltd. v. Pimienta, 110 F.Supp.2d 542, 548 (S.D. Tex. 2000) ("a cause of action that has not been reduced to a final judgment is not a 'vested right'"); accord Jarrett v. Climatrol Corp., 185 So.2d 63, 65 (La. App. 4th Cir. 1966) ("No individual has a vested right in a

---

[10]See supra, note 8 (Newman filed its campus plan suit against the City of Shreveport on September 19, 2003).

19

civil penalty . . . where a judgment recognizing the same has never become final in the sense that it was unappealable"); Hill v. Jacques Miller, Inc., 609 So.2d 327, 328 (La. App. 3d Cir. 1993) ("It is well settled that one never has a 'vested right' in a judgment of a court until the courts have lost control of the judgment as a result of its having become final and unappealable.") (citing 16 C.J.S. Constitutional Law § 271, pp. 1266, 1267).[11]

### 2.    The Retaliation Claims.

Newman argues the defendants' refusal to pay legal interest constituted an act of retaliation designed to punish it for utilizing its First Amendment right to seek judicial relief. See Record Documents 54 at 5 and 62 at 15. The elements of a valid retaliation claim are as follows: (1) a specific constitutional right, (2) the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. See Newman Marchive P'ship, Inc. v. Hightower, 349 F App'x 963, 966 (5th Cir. 2009). As to the second element, the plaintiff must prove that the retaliatory action was taken "in an effort to chill . . .

---

[11]The court also notes that the case of State through D.O.T.D. v. Estate of Davis, 572 So.2d 39, 44 (La. 1990), which is cited in Newman's memorandum, is distinguishable. That case dealt with legislation which altered the manner in which legal interest was to be calculated in a particular class of cases. The ordinance at issue in this case does not change the manner in which the courts are to calculate the judicial interest due. The ordinance simply establishes a payment policy for the municipality as to all awards of judicial interest, however those awards are calculated.

access to the courts or to punish [it] for having brought suit." Johnson v. Rodriguez,

110 F.3d 299, 310 (5th Cir. 1997).

The Fifth Circuit stated the following in regard to the present retaliation claim:

[The] decision by [the] city not to pay [the] plaintiff interest because it has sued the city has [the] potential to chill the exercise of First Amendment rights and is therefore sufficient to satisfy the third prong [of the retaliation analysis].

Record Document 54 at 6. As to the fourth prong of the retaliation analysis, causation, the Fifth Circuit stated:

There is . . . insufficient summary judgment evidence showing that the city would have taken the same actions regardless of retaliatory animus. In fact, the city's discovery responses indicate that Newman's decision to litigate was precisely the trigger for the city's adverse actions. Assuming, as did the district court, that the plaintiff made out its prima facie retaliation claim, the city failed to satisfy its summary judgment burden to show lack of causation.

Id. The court then concluded:

We therefore reverse the summary judgment on the retaliation claim and remand for consideration of *the remaining elements* of the retaliation analysis.

Id. (emphasis added). As this court interprets this language, further review of the

third prong of the retaliation analysis is foreclosed. The Fifth Circuit has decided that

the plaintiff has satisfied this portion of the retaliation analysis. As to the fourth

prong, the Fifth Circuit has indicated that as long as this court verifies its prior

assumption, and finds that Newman has indeed made a prima facie showing of

21

retaliation in this case, i.e., that Newman's protected conduct was a " 'substantial factor' or 'motivating factor' " in the city's adverse actions, then the fourth prong is satisfied. See Charles v. Grief, 522 F.3d 508, 516 n.28 (5th Cir. 2008). Therefore, in accordance with the Fifth Circuit's ruling, this court will now only examine the first and second prongs of the retaliation analysis, and will tender a finding as to whether Newman has made a prima facie showing of retaliation.

As to the first retaliation element, Newman asserts that it has a right under the First Amendment to pursue litigation against the City of Shreveport, including the right to:

> amend the petition, assert additional claims and convert the character of the lawsuit into a complex case requiring extensive discovery and a long jury trial.

Record Document 62 at 18. Newman's choice of language was inspired by comments made by representatives of the city throughout the record that the city was justified in treating Newman differently, particularly in regard to the stadium judgment, because Newman filed supplemental petitions in that case which increased the alleged damages by "nearly eight (8) times" the amount noted in the original petition. See Record Document 22, Ex. 3 at 4. The defendants have contended that this introduction of alleged meritless claims must "generally [be] considered to be an abuse of legal process," as Newman elevated a simple dispute into a complex

22

contractual claim spanning four years of work, requiring extensive discovery and five days of jury trial. See, e.g., id., Ex. 3 at 4 and Ex. 1 at 43-46, 65; Record Document 10, Exs. B and D.[12]

There is no dispute between the parties that the original, underlying claim giving rise to the stadium suit was not objectively baseless. See e.g., Record Document 22, Ex. 1 at 65-66. Furthermore, the court notes that jurors awarded Newman several hundred thousand dollars on its contractual claims in both the campus plan and stadium lawsuits, and that state appellate courts affirmed these awards with minor adjustments. See Record Document 62 at 2 (and citations therein). The evidence included in the record also fails to indicate that the amendments to the original state court petition in the stadium judgment were so devoid of merit that no reasonable litigator could reasonably expect success on these claims. See Bryant v. Military Dep't of the State of Miss., 597 F.3d 678, 691-92 (5th Cir. 2010). The stadium case was based on claims arising out of a contract between Newman and the City of Shreveport for the renovation of Independence Stadium in Shreveport. See Newman Marchive P'ship, Inc. v. City of Shreveport, 923 So.2d at 854. Although

---

[12]Relying on the Supreme Court's decision in Lewis v. Casey, the city argues that Newman must demonstrate actual injury resulting from an alleged denial of access to the courts in order to succeed in its retaliation claim. 518 U.S. 343, 116 S.Ct. 2174 (1996); Record Document 67 at 14. The defendants' reliance on Lewis is misplaced. See Record Documents 45 at 18 and 54 at 5; see also Patel v. Santana, 348 F. App'x 974, 977-78 (5th Cir. 2009).

the work was to be accomplished in three phases over the course of several years, it was considered to be one project. See id. The contract between Newman and the city was terminated before the final phases of initiated projects were completed. See id. at 855-56. After originally filing a petition seeking approximately $250,000 based on services previously rendered and expenses incurred, Newman filed amended petitions to seek approximately $1.5 million dollars based primarily on the loss of anticipated profits which it estimated it would have enjoyed had the contractual relationship with the city continued. See Record Document 10, Exs. L, M and N. There is no indication that the city filed a motion for partial summary judgment in state court after these amended petitions were filed. See Record Document 22, Ex. 2 at 4-5. The stadium case, as amended, was tried and submitted to a jury. See id. The jury found Newman was due sums from the City of Shreveport "under either contract or value of services" in the amount of $251,304.34, but was not due any payment for loss of anticipated profits. See Record Document 10, Ex. O; see also Bryant, 597 F.3d at 691-92 (finding that the determination as to whether a claim is objectively baseless is not simply determined by whether the litigant won or lost the suit). Based on the evidence in the record, the court agrees with Newman and finds that the litigation activity at issue was protected by the First Amendment.

The court also agrees with Newman that the record evidence conclusively

24

shows that a substantial motivating factor behind the defendants' decision to deny Newman payment of judicial interest on both of its judgments[13] was the defendants' intent to retaliate against it for the exercise its First Amendment right to seek judicial relief. See Record Document 22, Ex. 3, Answer to Interrogatory 2; id., Ex. 1 at 30, 42-47, 65; Record Document 10, Exs. B and D.

When the findings above are combined with the findings in the Fifth Circuit's ruling in this case in regard to the third and fourth elements of the retaliation claim test, this court concludes that Newman has successfully shown that it suffered a deprivation of a constitutional right as it was the object of an unconstitutional retaliatory act by the City of Shreveport. See Record Document 54 at 5-6. There is no question of fact remaining as to this issue, and summary judgment will be granted on this point in Newman's favor.

## C.  Assessment Of Liability.

### 1.  Liability Of The City.

Under section 1983, in order to demonstrate that the City of Shreveport and its mayor, in his official capacity, are liable for the deprivations of rights described

---

[13]The city has justified its decision not to pay judicial interest on the campus plan judgment by referencing a newly passed city ordinance. The defendants have admitted that Newman's litigation tactics were a substantial motivating factor in passing this ordinance. See Record Document 22, Ex. 3

above, Newman must show proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose "moving force" is the policy or custom. See Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir.2001).

Newman correctly notes that a single decision by a municipal policy maker may constitute an official policy for purposes of liability under section 1983. See Record Document 62 at 26-27; see also Gelin v. Housing Auth. of New Orleans, 456 F.3d 525, 527 (5th Cir. 2006). However, the law demands that the single decision must be made by an official or governmental body who speaks with final policymaking authority in regard to the specific decision alleged to have caused the particular constitutional or statutory violation at issue. See id.; see also Brady v. Fort Bend Cnty., 145 F.3d 691, 699 (5th Cir. 1998).

> The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

Id. at 698-99 (quoting Pembar v. City of Cincinnati, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 1299-1300 (1986)).

> [T]he identification of those officials whose decisions represent the official policy of the local governmental unit is a question of state law to be resolved by the trial judge before the case is submitted to the jury. The sources of state law which should be used to discern which

26

municipal officials possess final policymaking authority are state and local positive law, as well as custom or usage having the force of law.

Gelin, 456 F.3d at 527 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724 (1989)).

### a.    The Equal Protection Violations.

In the sections above, the court found that Newman's right to equal protection was violated in two ways.   First, the city failed to pay the judicial interest on Newman's stadium judgment, and, second, Newman's judgments were not simply paid by a check signed by the mayor, but were instead referred to the risk management committee for a post-judgment determination of whether and/or how much the city would actually pay Newman, based, in part, on a special review of Newman's prejudgment activities.

As to the decision not to pay Newman the full amount due on its stadium judgment, this decision was initially made by the mayor when he referred this matter to risk management committee instead of paying the judgment.   See Record Document 22, Ex. 11 at 7-9.[14]   Thereafter, the risk management committee decided

---

[14]Shreveport's chief administrative officer, Antee, held conversations with the mayor regarding Newman's stadium judgment in which he expressed the opinion that the city "ought to not pay the bastard," referring to Newman, and advised the mayor to refer the Newman stadium judgment to the risk management committee. See Record Document 22, Ex. 1 at 30-31 and Ex. 11 at 7.   The mayor expressed agreement with the chief administrative officer's position regarding payment, and decided to refer the judgment to the risk management committee. See Record Document 22, Ex. 1 at 37-38 and Ex. 11 at 7-8, 32-33. When the risk management committee convened to consider Newman's judgment and voted to approve payment of the

27

on September 11, 2006, not to pay Newman the judicial interest due on the stadium

judgment. See id., Ex. 3, Answer to Interrogatory No. 2. The committee's decision

was, in effect, adopted by the Mayor as his own when he decided to abide by it and

continued to refuse to issue a check paying the judicial interest.[15] This decision was

also ratified by the city council as they have rejected[16] a resolution making provision

principal amount due but not judicial interest, one of the six committee members was absent and
another abstained. See Record Document 10, Ex. F. The remaining four committee members
were Shreveport's chief administrative officer, city attorney, director of finance and risk
manager. See id., Exs. B, C, D and F. Each of these officials was appointed by the mayor, and
served, at least in part, the executive branch of Shreveport's municipal government. See Record
Document 22, Ex. 10, § 5.02(a) and 8.02(a); SHREVEPORT, LA., CODE § 26-27. The committee
member who moved that the risk management committee should approve payment of the
principal due but forego payment of judicial interest was the mayor's chief administrative officer.
See Record Document 10, Exs. D and F.

[15]This court notes Judge Fred C. Sexton's concurring opinion regarding the stadium
judgment. He stated:

> I do not accept the Mayor's position that the decision not to pay the interest was
> made by the Risk Management Committee. It is clear from the testimony of Mr.
> Tom Cody, Risk Manager for the City of Shreveport, that the question of whether to
> pay this judgment at all was not taken before the Risk Management Committee until
> approximately one week before the writ of mandamus was filed herein. A review of
> the previous litigation [] causes me to believe that the Mayor made the political
> decision not to pay the interest on this judgment and the Risk Management
> Committee simply ratified that decision.

Newman Marchive P'ship, Inc. v. City of Shreveport, 962 So.2d 1075, 1079 (La. App. 2d Cir.
2007) (Sexton, J., concurring).

[16]The record indicates that a resolution was proposed to make provision for the payment
of Newman's stadium judgment, including the judicial interest attached thereto. The council
voted to postpone the proposed legislation pending the adoption of a city policy regarding the
payment of judgments. See Record Document 22, Ex. 12a at 416 and 422-23. The council
then adopted the city policy discussed throughout this ruling which states that the City of Shreveport
will not pay judicial interest on state court judgments. In the defendants' words, the city council
"defeat[ed] a resolution seeking to override the decision of the Risk Management Committee not

for the payment of the judicial interest due on the stadium judgment.[17]  <u>See</u> Record

Document 22, Ex. 12a at 416 and 422-23; Record Document 22, Ex. 4 at 27; <u>Shelton</u>

<u>v.  City of College Station</u>, 754 F.2d 1251, 1257-58 (5th Cir. 1985) (city could be

liable under section 1983 for board's decision to grant <i>or deny</i> a zoning variance);

<u>accord</u> <u>Stone's Auto Mart, Inc. v. City of St. Paul</u>, 721 F.Supp. 206, 208 (D.  Minn.

1989) ("The city council's decision <i>to deny</i> plaintiff's rezoning request is an official

decision of the city's governing body.") (emphasis added); <u>Bateson v. Geisse</u>, 857

F.2d 1300, 1303 (9th Cir. 1988) (decision by city council <i>to withhold</i> building permit

represented an act of official government policy for purposes of section 1983).  The

court finds that the mayor[18] and/or the city council constitute the final policy making

authority[19] of the City of Shreveport in regard to the payment of judicial interest.[20]

---

to pay plaintiff its interest." Record Document 22, Ex.  3 at 4 (emphasis added).

[17]The mayor testified that it was highly unusual for the council to introduce a resolution to pay a particular judgment.  <u>See</u> Record Document 22, Ex.  4 at 27.

[18]<u>See</u> <u>infra</u>, pp.  30-34.

[19]"The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Worsham v.  City of Pasadena</u>, 881 F.2d 1336, 1341 (5th Cir.1989) (quoting <u>Pembar v.  City of Cincinnati</u>, 475 U.S. 469, 479, 106 S.Ct.  1292, 1298 (1986)). It is clear that this case involves duly elected officials, empowered by the citizenry to render the decisions at issue under the clear terms of a home rule charter, not simply employees hired by the city.  <u>See</u> Record Document 22, Ex.  10.

[20]The defendants have claimed that either Shreveport's risk management committee or director of finance is the final policy maker in regards to the payment or nonpayment of judgments (including judicial interest) levied against the city.  <u>See</u> Record Document 67 at 17-

Furthermore, the decisions of the mayor and the city council were the moving force behind the deprivation of Newman's constitutional right of equal protection.  See Peterson v.  City of Fort Worth, 588 F.3d 838, 848 (5th Cir. 2009) ("moving force behind the violation" means "there must be a direct causal link between the policy and the violation").  Thus, the city is liable for this deprivation of rights.

As to the decision to refer Newman's judgments to the risk management committee for a post-judgment determination of whether and/or how much the city would actually pay Newman, this decision was the mayor's.[21]  As explained below,

_____

18.  Neither assertion is correct. The record establishes that prior to the time when the risk management committee reviewed Newman's judgments and the judgment of one other creditor, Whitaker, the risk management committee had not considered any cases in which judgment was rendered. See, e.g., Record Document 22, Ex. 4 at 30; id., Ex. 1 at 24-25, 50-52. Furthermore, the ordinance establishing the risk management committee and the series of laws surrounding that provision do not assign that committee the duty of approving the payment of judgments. See Record Document 30, Ex.  6.  Section 26-172 of the city ordinances establishes the city's retained risk fund for the purpose of paying "claims and judgments." See id. (noting these as two separate forms of monetary demand).  Section 26-174 states that the purpose of the risk management committee is to simply decide whether "*claims* in excess of $10,000 should be approved, based on the legal merits of the claim." See id. (emphasis added); see also Newman Marchive P'ship, Inc., 962 So.2d at 1079 (Sexton, J., concurring). As to the director of finance, while it is true that under the city charter this officer must make provision for the payment of the city's lawful debts and for audits, before payment, of all claims and demands against the city for legality and correctness, he must do all of these things with the approval of the chief administrative officer, who in turn reports to the mayor. See Record Document 22, Ex.  10, §§ 5.02, 5.07 and 10.02.

[21]The court also notes, however, that the council was informed the stadium judgment had been referred to the risk management committee after it was final and non-appealable. See, e.g., Record Document 22, Ex.  12a at 421 (minutes of city council meeting).  At least one speaker testified that it was highly unusual and perhaps unprecedented that this final non-appealable judgment had gone to the risk management committee. See id. The record does not indicate that the council took any action which would deter this sort of decision in the future, or to repudiate

both the local positive law[22] and custom and usage establish that the mayor was the final policymaking authority in this regard.

The charter of the City of Shreveport states that the director of finance shall make provision for the payment of all the lawful debts of the city, and that the mayor shall sign all instruments or documents requiring the assent of or execution by the city. See Record Document 22, Ex. 10, §§ 5.02 and 10.01. The record confirms that when judgments are paid by the city, the mayor signs the checks and he does so without approval by the city council. See Record Document 22, Ex. 4 at 22 (transcript of hearing recording the mayor's statement that he authorizes and signs checks to pay judgments rendered against the city out of the retained risk fund without the necessity of a vote of the city council). Furthermore, the charter states that the director of finance shall, with the approval of the chief administrative officer, audit before payment for legality and correctness, all accounts, claims and demands against the city. See Record Document 22, Ex. 10, § 10.02 (introduction and subpart (h)). The mayor appoints both the chief administrative officer and the head of the

the mayor for acting in this manner.

[22]State law has little to do with this decision. See La. R.S. 33:321; La. Const. Art. 6, § 6 ("The [state] legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter."). The city government of Shreveport operates under the authority of a home rule charter. See Record Document 22, Ex. 10.

31

department of finance and supervises both of these officials pursuant to his possession of all executive and administrative powers under the city charter. See id., Ex. 10, § 5.02 and 8.02(a). The interplay between these roles had an effect in the present case. The record shows that the mayor decided to refer the stadium judgment to the risk management committee rather than pay Newman's final stadium judgment after conversing with his chief administrative officer. See id., Ex. 11 at 7-9. Finally, the article of the city charter addressing the executive branch, i.e., the mayor, includes the following provision:

> Section 5.06 Assignment of duties not specifically assigned by this Charter or by ordinance.
>
> Subject to the limitations set forth in section 4.20 hereof, and applicable state law, all duties, functions or activities of the several departments of the city may be assigned or reassigned by the mayor in any manner not inconsistent with the provisions of this charter.

See Record Document 22, Ex. 10, § 5.06. When this provision is considered with the those cited previously, it is clear the city charter grants the mayor[23] final

---

[23]The court also notes that the mayor's role as the head of the city's executive branch, rather than the city's legislative branch, does not disqualify him under the law from serving as a final policymaker in a section 1983 action. "[T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level, and [] the isolated decision of an executive municipal policymaker, therefore, could likewise give rise to municipal liability under § 1983." See Praprotnik 485 U.S. at 138, 108 S.Ct. at 932 (plurality) (Brennan, J., concurring) (citing Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298-99). Municipalities often distribute power among a host of different officials and official bodies, and local law will usually direct the court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business. See id. at 124-

policymaking authority to decide when and/or if to pay final judgments or to order further review of said judgments by the risk management committee prior to payment.

As stated, in addition to local positive law, custom and usage established that the mayor had the final policymaking authority in this regard.[24]   As previously discussed, over the course of eight to ten years in which nearly twenty-five judgments were rendered against the city, with the exception of Newman's judgments and the Whitaker judgment, the mayor was responsible for assessing the legality and correctness of the legal demands asserted against the city and the mayor made the decision to sign a check paying the amount listed in the judgments presented. These actions were done without the necessity of any action or approval by the city council. See Record Document 22, Exs. 1 at 50, 5, and 4 at 22. The record further indicates that the decision as to whether or not to pay a state court judgment or whether to refer the matter to the risk management committee for further review is made by the mayor, without the required consent of any other individual or governing body. See id., Ex.

---

25, 108 S.Ct. at 925.

[24]See Jett, 491 U.S. at 737, 109 S.Ct. at 2724; see also Praprotnik. 485 U.S. at 138, 108 S.Ct. at 932 (plurality) (Brennan, J., concurring) ("Where [the] agents [of a municipality] act in accordance with formal policies, or pursuant to informal practices so permanent and well settled as to constitute a 'custom or usage' with the force of law we naturally ascribe their acts to the municipalities themselves and hold the latter responsible for any resulting constitutional deprivations."); Worsham v. City of Pasadena, 881 F.2d 1336, 1343 (5th Cir.1989) (Goldberg, J., concurring) (citing Jett, supra).

1 at 50 and Ex. 11 at 7-9. There is also no record of any routine, established, meaningful procedure, past or present, for the review of the mayor's decisions in this regard. See Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003) (discussing Worsham v. City of Pasadena, 881 F.2d 1336, 1341 n.9 (5th Cir. 1989)) (noting that when an ordinance specifically provided that all actions of a certain class were subject to review by a commission, this meaningful review procedure established that the mayor was not the final policymaking authority in regard to this class of actions).

In sum, the mayor's decision to refer the judgments to the risk management committee rather than pay the judgments was a moving force in the denial of the right of equal protection under the law. Since the mayor had final policymaking authority to render this decision, the court finds that the city is liable for the resulting deprivation of constitutional rights.

### b.     The Retaliation Claim.

The city is also liable for the violation of Newman's First Amendment right to pursue judicial relief without unconstitutional retaliation. As explained above, the final policymaker(s) of the city has/have decided to deny Newman payment of the judicial interest owed on the stadium judgment. It is also clear that the same policymakers have decided not to pay Newman judicial interest on the campus plan judgment. As the Fifth Circuit has noted, the defendants in this case have admitted

that these decisions were made, in substantial part, because of Newman's litigation tactics, which the defendants considered to be an "abuse of the judicial system." See Record Document 22, Ex. 3, Answer To Interrogatory No. 2; Record Document 54 at 6.

### 2.    Mayor Hightower's Personal Liability.

Newman has successfully alleged constitutional violations. Newman argues that Mayor Hightower's decision to refer Newman's judgments to the risk management committee and his decision to act in accordance with the risk management committee's decision not to pay Newman judicial interest led to the deprivation of its constitutional rights. See Record Document 62 at 35-36. The court agrees. As explained above, Mayor Hightower's referral of Newman's judgments to the risk management committee violated Newman's right to equal protection under the law. Furthermore, Mayor Hightower's decision not to pay Newman judicial interest on the stadium judgment violated Newman's right to equal protection. Further, both this last action and the decision not to pay Newman judicial interest on the campus plan judgment were retaliatory acts designed to punish Newman for its constitutionally protected litigation activities. Now, Newman seeks to hold Mayor Hightower personally liable for these actions.

To secure a finding that former Mayor Hightower is liable in his individual

capacity, Newman bears the burden to demonstrate that Mayor Hightower is not

entitled to qualified immunity.[25] The Fifth Circuit has indicated the question

presented requires a two-step analysis:

> First, the court must determine whether the plaintiff has alleged a
> violation of a clearly established constitutional right[[26]]. If the plaintiff
> fails this step, the defendant is entitled to qualified immunity. If she is
> successful, the issue becomes the objective legal reasonableness of the
> defendant's conduct under the circumstances [and given the clearly
> established law at the time the challenged conduct occurred].

Baker v. Putnal, 75 F.3d 190, 198 (5th Cir. 1996); Glenn v. City of Tyler, 242 F.3d

---

[25]See Felton v. Polles, 315 F.3d 470 (5th Cir. 2002) (noting Fifth Circuit precedent places the burden on the plaintiff to defeat a claim of qualified immunity); see also Spencer v. Rau, 542 F.Supp.2d 583, 589 (W.D. Tex. 2007) (quoting Pierce v. Smith, 117 F.3d 866, 871-72 (5thCir. 1997)).

[26]In Anderson v. Creighton, the Supreme Court stated:

The operation of [the "clearly established"] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."

483 U.S. 635, 639, 107 S.Ct. 3034, 3039-40 (1987).

307, 312 (5th Cir. 2001). Since Baker, the courts have provided additional instruction as to these two steps.

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Hope v. Pelzar, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515 (2002) (internal quotations and citation omitted). Objective reasonableness is gauged by assessing whether at the time and under the circumstances of the challenged conduct "*all* reasonable officials" in the same circumstances would have come to the realization that the conduct complained of violated a constitutional provision. See Pierce v. Smith, 117 F.3d 866, 871 (5th Cir. 1997) (emphasis added).

> The Fifth Circuit has held that:

> The issue of whether and when a right is clearly established is typically treated as a question of law. Likewise, to the extent that the relevant discrete, historic facts are undisputed . . . the question of the objective reasonableness of the defendant's conduct – i.e., whether at the time and under the circumstances all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on – is also a question of law.

Pierce, 117 F.3d at 871 (citations omitted). The court enters into the required analysis acknowledging that qualified immunity protects "all but the plainly incompetent or

those who knowingly violate the law." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638, 107 S.Ct. 3034, (1987) (citation and quotations omitted).

Newman has cited several cases which demonstrate that the right of equal protection and the prohibition against government retaliation in response to protected speech was *generally* established at the time of the alleged misconduct. <u>See</u> Record Document 62 at 33-34. However, these cases do not, in the court's estimation, show that at the time of the actions at issue in this case the mayor should have realized he was violating clearly established law. These cases do not define the contours of the pertinent law with the specificity required to establish the mayor's personal liability. <u>See generally</u> <u>Anderson</u>, 483 U.S. at 639, 107 S.Ct. at 3039-40. Furthermore, this court cannot say that the mayor's actions were not "objectively reasonable" as a matter of law, <u>i.e.,</u> that all reasonable officials in the mayor's position would have realized that the conduct complained of violated a constitutional provision. <u>See</u> <u>Pierce</u>, 117 F.3d at 871. Thus, summary judgment will be denied as to the individual capacity claims against Mayor Hightower.

### III. CONCLUSION

As set forth above, on remand, Newman's motion for partial summary judgment in this section 1983 claim is **GRANTED** in part and **DENIED** in part. In regard to the equal protection claims, the city is liable for treating Newman differently

than other similarly situated judgment creditors by referring Newman's judgments to the risk management committee for a post-judgment decision as to whether and/or how much to pay Newman, and for denying Newman payment of judicial interest on the stadium judgment.  However, the city had a rational basis for denying Newman payment of judicial interest on the campus plan judgment.  Newman also has proven its retaliation claim against the city as to both judgments.  Finally, the court finds that former Mayor Hightower cannot be held personally liable for the infractions noted above.

The defendants' motion for summary judgment is **GRANTED** insofar as the court finds that part of Newman's equal protection claim must fail since the city had a rational basis for denying payment of judicial interest on the campus plan judgment and that Mayor Hightower was not personally liable for the infractions noted herein. In all other respects, the defendants' motion for summary judgment is **DENIED**.

In accordance with the findings noted above, and there being no other outstanding issues in this case, the court finds that Newman is entitled to damages in regard to both the stadium judgment and the campus plan judgment.  Newman has asserted that on January 15, 2010, the amount at issue was $226,925.98, and that $18.98 per day should be added to this amount for each day damages remain unpaid for the remainder of the calendar year 2010.  <u>See</u> Record Document 62 at 36.

Newman may provide supplemental briefing as to the amount of damages due on or before Friday, August 27, 2010.  The defendants may also offer a response regarding the proper amount of damages due on or before Thursday, September 2, 2010. Finally, Newman may reply to any response by the defendants on or before Tuesday, September 7, 2010.[27]

An order consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this ___18th___ day of August, 2010.

_____
JUDGE TOM STAGG

---

[27]After a five-judge panel of the Louisiana Second Circuit Court of Appeals ordered that a peremptory writ of mandamus issue, requiring the mayor of Shreveport to pay the judicial interest due on Newman's stadium judgment, the defendants appealed to the Louisiana Supreme Court.  See Newman Marchive P'ship, Inc., v.  City of Shreveport, 979 So.2d 1262 (La.  2008). The Louisiana Supreme Court reversed the judgment of the five-judge panel, finding that while Louisiana's constitution provided the state judiciary with the authority to render judgments against a municipality, it did not empower the state judiciary to execute those judgments.  In doing so, the court recognized that their holding effectively provided Newman "a right without a remedy."  See id. at 1270.  Under the laws of the United States, this court finds that Newman is entitled to a remedy for the constitutional violations noted herein.